UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **PAMALA PELLON-IRWIN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| **EASTERN MAINE HEALTHCARE** ) | |
| **SYSTEMS, d/b/a NORTHERN** ) | |
| **LIGHT HEALTH,** ) | |
| ) | |
| and ) | |
| ) | |
| **MRH CORP., d/b/a NORTHERN** ) | |
| **LIGHT MAYO HOSPITAL,** ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Pamala Pellon-Irwin (hereinafter "Plaintiff" or "Pellon-Irwin"), by and through undersigned counsel, hereby complains against Defendants as follows:

### INTRODUCTION

1. Eastern Maine Healthcare Systems, d/b/a/ Northern Light Health is Maine's second largest healthcare provider and a frequent perpetrator of sex-based discrimination, with an egregious history of discriminating against women in employment.

1

2. Pamala Pellon-Irwin is a Maine licensed nurse practitioner who worked at Defendant Northern Light Mayo Hospital ("Mayo") from 2017 until 2022 when she was fired for retaliatory and discriminatory reasons.

3. This case arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4571 *et seq.*, and the Maine Whistleblower Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq.*

4. Pellon-Irwin alleges willful and intentional discrimination against her based on sex, retaliation for opposing a practice made unlawful by Title VII and the MHRA, and whistleblower retaliation by Defendants.

## JURISDICTION, PARTIES, AND VENUE

5. Plaintiff Pamala Pellon-Irwin (hereinafter "Plaintiff" or "Pellon-Irwin") is an individual residing in the City of Brewer, County of Penobscot, and State of Maine.

6. Defendant Eastern Maine Healthcare Systems, d/b/a Northern Light Health ("Northern Light"), is a duly organized Maine Nonprofit Corporation with a principal place of business in the Town of Brewer, County of Penobscot, and State of Maine.

7. Defendant MRH Corp., d/b/a Northern Light Mayo Hospital ("Mayo Hospital"), is a duly organized Maine Nonprofit Corporation and a hospital that is part of Northern Light Healthcare Systems, with a principal location in the Town of Dover-Foxcroft, County of Piscataquis, and State of Maine.

8. At all times herein relevant, Northern Light and/or Mayo Hospital employed Pellon-Irwin.

9. Defendants have had more than 200 employees on their payroll in each of 20 or more calendar weeks during the current and/or preceding calendar year.

10. Upon information and belief, Defendants were a joint employer of Plaintiff or an integrated enterprise under Maine law based on centralized control of all high-level corporate governance, finance, management, and labor relations. Hence, these joint employers were hereinafter be referred to collectively as "Northern Light," unless the circumstances indicate otherwise.

11. Prior to filing this Complaint, Pellon-Irwin filed a complaint of discrimination with the Maine Human Rights Commission ("MHRC") and the EEOC on or about February 21, 2023. Pellon-Irwin received a notice of right to sue letter from the MHRC pursuant to 5 M.R.S. §§ 4612(6) and 4622(1)(C) on or about March 12, 2025. Pellon-Irwin received a notice of right to sue from the EEOC on or about May 7, 2025.

12. Venue is proper in this Court because all of the discriminatory practices alleged herein occurred in Penobscot or Piscataquis County, Maine.

13. The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS

14. Pellon-Irwin began working for Mayo Regional Hospital ("Mayo Hospital") out of the Milo, Maine location on April 1, 2018.

15. Pellon-Irwin received her license as a registered nurse in July of 1999. She received a Masters of Science in Nursing in 2003 and became a certified Nurse Practitioner in 2004.

16. Northern Light hired Pellon-Irwin as a family nurse practitioner in 1999.

17. In November of 2017, Northern Light's Mayo Hospital in Dover-Foxcroft hired Pellon-Irwin. Her first 90-day review conducted by her supervisor, Dr. James? McDermott, said that she was "off to a great start as we redefine our staffing model for the hospitalist service!"

18. In May 2019, Pellon-Irwin began working in the emergency department ("ED") at Mayo Hospital, and she also worked as a nurse practitioner and hospitalist on behalf of Northern Light in the Piscataquis County Jail medical clinic.

19. During her time with Mayo Hospital, Pellon-Irwin was one of the few providers able to work in both the ED and hospitalist settings.

20. Also during her time at Mayo Hospital, Pellon-Irwin was the only fulltime female provider in the ED. Staff turnover, unpredictable scheduling, and interpersonal conflicts—including among staff and between staff and management made working conditions difficult in both settings.

21. Pellon-Irwin frequently contributed to efforts to improve areas of dysfunction including chaotic shift scheduling, chronic understaffing, and inefficient documentation policies.

22. Throughout her employment with Northern Light, Pellon-Irwin was subjected to frequent sex-based harassment from male colleagues and supervisors.

23. One colleague, a physician's assistant named Charles Reimers ("Reimers"), would frequently harass Pellon-Irwin. The harassment ranged from inappropriate comments to unwanted touching.

24. Reimers had a history of this conduct that Mayo Hospital and Dr. McDermott knew about yet did nothing to prevent.

25. During Pellon-Irwin's first interaction with Reimers, he squeezed her backside and said "give me some good ass love, baby." Pellon-Irwin was stunned, horrified, and too shocked to respond.

26. Later that day, Pellon-Irwin reported the interaction to the nursing supervisor but nothing was done.

27. Reimers made several disgusting comments to Pellon-Irwin while they were working together, including that he wanted to "put [his] warm liquid in [my] mouth" and that he "really want[ed] a blow job," plainly insinuating that he was asking Pellon-Irwin to do it.

28. Reimers often physically harassed Pellon-Irwin at work. He would sneak up behind her and hug her without asking permission. Reimers would use this opportunity to push his genitals into Pellon-Irwin's backside and grind himself into her.

29. At one point, Reimers spanked Pellon-Irwin as she was walking out of the hospital to go home.

30. Embarrassed and shocked once again, Pellon-Irwin had no idea what to do so she just walked away.

31. Reimers' sexual harassment made Pellon-Irwin feel violated and unsafe in her workplace.

32. Pellon-Irwin was not Reimers' only victim. Mayo Hospital and Northern Light allowed him to harass other female colleagues for years.

33. Eventually, in March 2021, a coworker of Pellon-Irwin's, S.S., decided to report him to Dr. McDermott.

34. S.S. and Pellon-Irwin had previously discussed their experiences with Reimers and noticed that they both faced very similar treatment. With Pellon-Irwin permission, S.S. reported Reimers' conduct on behalf of both women.

35. Dr. McDermott responded to S.S.'s report by stating that Reimers was "making many changes in his life," implying that he knew all about Reimers' behavior and that he had done nothing to stop it in the past. Rather than terminate him, Mayo Hospital allowed Reimers to resign from his position. This meant that nothing about his behavior was included in his personnel file and that the next medical facility to hire him would be unaware of his disgusting and blatant sexual harassment of female coworkers.

36. After Defendants allows Reimers to voluntarily resign, the then-HR director for Mayo Hospital told Pellon-Irwin that she could "never talk about what happened with [Reimers]."

37. Then, after Reimers left, two male colleagues in the ED started treating Pellon-Irwin with increased hostility. Upon information and belief, their hostility toward Plaintiff was the result of their suspicion that she had been the person to report Reimers' sexual harassment.

38. These male colleagues continued mistreating Pellon-Irwin until they learned that she was not the person who directly reported Reimers' conduct to HR.

39. Upon learning this information, the male colleagues focused their hostility on S.S. She quit her job at Mayo Hospital less than a year later because of the hostile work environment that she faced.

40. Throughout Pellon-Irwin's five years at Mayo Hospital, she also experienced severe and pervasive hostility from male providers in and out of the ED. Their hostile and abusive actions included screaming at Plaintiff, physical intimidation, violently cursing at her, and openly disrespecting Pellon-Irwin in front of her colleagues and patients.

41. On several occasions, a PA named Jesus Gandarillas ("Gandarillas") would scream and curse at Pellon-Irwin in front of colleagues and within ear shot of patients. Often his tirades were a result of something trivial, such as Pellon-Irwin talking about her daughter or which seat she chose to sit in at the nursing station.

42. During one particularly hostile incident, Gandarillas came into Pellon-Irwin small office in a rage. She tried to deescalate the situation, but Gandarillas was too outraged and irrational to listen to reason. He used his body to take up the entire doorway, blocking Pellon-Irwin's exit, while continuing on a screaming tirade. Unable

to escape, Pellon-Irwin was forced to sit there and take his verbal abuse until he tired himself out and left her office.

43. On April 6, 2022, Dr. McDermott texted Pellon-Irwin regarding a potential new employment contract. She noticed that the contract contained an open-ended non-compete clause, demanding that Pellon-Irwin seek Mayo's consent to work in any other medical setting, regardless of its distance from Mayo.

44. Pellon-Irwin found the above non-compete clause suspicious, as Mayo Hospital knew that she had a second part-time job at a small medical facility in Farmington. When Plaintiff asked Dr. McDermott about the issue, he said that he would fix it.

45. Later, Pellon-Irwin asked her male colleagues whether their new contracts contained a similar non-compete clause. Both colleagues reported that their contracts contained thirty-mile non-compete clauses. Pellon-Irwin, by contrast, was never offered a contract with a thirty-mile non-compete clause. The open-ended non-compete contract remained the only contract offered to Plaintiff until her termination.

46. On April 18, 2022, Pellon-Irwin was working with a young patient. The patient's mother was in the room as well, along with Plaintiff's supervisor, another nurse who happened to also work where this patient attended school. The supervisor decided to call for anesthesia, for which Plaintiff cosigned. Pellon-Irwin then left the room to attend to other patients.

47. When Pellon-Irwin returned to the room to finish working with the young patient, a registered nurse named Erik Cline ("Cline") stood at the doorway.

Cline was upset with Plaintiff because of a policy that required a provider to call for anesthesia, not a supervisor. Cline alleged that by allowing the supervisor to call for anesthesia instead of a provider, Plaintiff had violated hospital policy. However, that policy also provides that supervisors or other personnel can call for anesthesia if the ED is too crowded, which it was on this particular night.

48. Cline behaved in an openly disrespectful and unprofessional manner toward Plaintiff in front of the patient and his mother. Even if his concerns about a policy violation were legitimate, which they were not, Cline's response was completely unacceptable in the middle of ongoing patient care.

49. Not wanting to heighten the tension while the patient was still in the room, Pellon-Irwin ignored Cline's behavior, kept her head down, and continued to provide patient care.

50. The next day, Cline came into Plaintiff's office to confront her about the incident. Cline began screaming at Pellon-Irwin while blocking the doorway to her office.

51. During his tirade, Cline walked up to Pellon-Irwin's chair and stood over her while screaming and cursing. After Cline finished screaming, Plaintiff explained that even if he had been concerned about a policy violation, it was wrong of him to disrespect her in front of a patient. Cline grew agitated again and dismissed Plaintiff. He interrupted her, raised his voice over hers, refused to continue the conversation, and rushed out of the office. It was an incredibly belittling and abusive experience,

and Cline's behavior itself violated Northern Light's own Code of Conduct for the treatment of patients and staff.

52. On April 19, 2022, Pellon-Irwin emailed Dr. McDermott to explain Cline's abusive and inappropriate conduct. She reported Cline's unprofessional behavior, but rather than address these concerns, Dr. McDermott immediately blamed Pellon-Irwin for the issue and absolved Cline of any wrongdoing.

53. Dr. McDermott's woefully inadequate response to Plaintiff's report about Cline was consistent with his own frequently belittling and unprofessional conduct toward women, which has been documented in at least one other court case involving direct allegations of gender discrimination against Dr. McDermott.

54. HR Director Kristy Rizzitello ("Rizzitello") asked Pellon-Irwin to meet with HR and discuss the hostile work environment in the ED of Mayo Hospital. Plaintiff met with HR on April 20, 2022.

55. Pellon-Irwin later learned that other ED providers were called into HR for similar discussions about the hostile work environment at Mayo Hospital.

56. Pellon-Irwin disclosed to HR the issues she had with Reimers, including sexual/inappropriate touching and disgusting comments of an unwelcome nature.

57. Pellon-Irwin disclosed to HR that certain male coworkers had engaged in frequent, unprofessional outbursts and physical intimidation. She described the general hostility that these particular male coworkers exhibited toward her, and that Dr. McDermott also ignored or belittled Plaintiff when she reported the issues.

58. During the April 20, 2022 meeting, Pellon-Irwin also reported to HR several examples of substandard care in the ED, one of which resulted in the death of a patient. Rizzitello took notes throughout the meeting, but Northern Light omitted those notes its response to Plaintiff's statutory personnel file request made under 26 M.R.S. §§ 630, 631.

59. The very next day, April 21, 2022, Dr. McDermott began emailing Pellon-Irwin's colleagues in retaliation to solicit negative and unfair criticism of her performance.

60. Dr. McDermott then passed the retaliatory criticism he gathered about Plaintiff on to HR (Rizzitello), even though much of the criticism was unfounded or lacked proper context.

61. Pellon-Irwin did not learn about Dr. McDermott's solicitation of pretextual criticism until after her termination, when his emails appeared in her personnel file.

62. Defendants terminated Pellon-Irwin's employment on April 27, 2022, one week after she reported harassment and the substandard care that she witnessed in the ED.

63. On the morning of April 27, 2022, Dr. McDermott called Plaintiff and notified her that she was being terminated because of an incident two weeks prior when she did not register a patient who was forcibly taken to the ED by her group home.

64. Pellon-Irwin explained to Dr. McDermott that she was unable to register the patient, because the patient refused to be seen (or registered). Therefore, she could not create a note documenting this fact. Eyewitnesses confirmed Pellon-Irwin's version of events, but Defendants ignored that information.

65. Defendants' creation of a hostile work environment, quid pro quo sexual harassment, sex-based discrimination, and retaliation against Plaintiff were all undertaken willfully, or with reckless disregard for whether Defendants' conduct violated Plaintiff's rights.

**COUNT I – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII**
**(42 U.S.C. § 2000e *et seq.*)**
**(HOSTILE WORK ENVIRONMENT)**

66. Plaintiff repeats the allegations contained in Paragraphs 1 through 65 as if fully stated herein.

67. Pellon-Irwin is a female and a member of a protected class based on sex.

68. Title VII makes it illegal for an employer to discriminate against an employee based on sex.

69. Defendants subjected Plaintiff to a hostile working environment in violation of Title VII.

70. The work environment at Northern Light/Mayo Hospital was both objectively offensive to any reasonable person and subjectively offensive to Pellon-Irwin.

71. The harassment Pellon-Irwin complained of, including being placed in actual fear of harm by male colleagues with no legitimate corrective action by Defendants to remedy the harassment, was severe and pervasive.

72. Employer liability exists in this case based on Northern Light's systemic and individual failures to remedy sex-based harassment, as described above.

73. A continuing violation of Title VII has occurred in this case, dating all the way back to Reimers' blatant and shocking sexual harassment of Plaintiff and another female, which the same management employee (Dr. McDermott) failed to adequately address.

74. As a result of Defendant's discrimination and willful violation of Title VII, Pellon-Irwin has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Pamala Pellon-Irwin requests that the Court award her damages for Defendants' violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT II – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
**(42 U.S.C. § 2000e *et seq.*)**
**(QUID PRO QUO)**

75. Plaintiff repeats the allegations contained in Paragraphs 1 through 74 as if fully stated herein.

76. For all of the reasons set forth above, Pellon-Irwin was subjected to unwelcome sexual advances, harassing conduct, violent behavior, and other discrimination based on sex. When Pellon-Irwin failed to succumb to this kind of behavior, and instead complained about it to HR on numerous occasions, Northern Light/Mayo Hospital retaliated.

77. A continuing violation of Title VII has occurred in this case.

78. As a result of Defendant's discrimination and willful violation of Title VII, Pellon-Irwin has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Pamala Pellon-Irwin requests that the Court award her damages for Defendants' violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT III – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
**(42 U.S.C. § 2000e *et seq.*)**
**(DISPARATE TREATMENT)**

79. Plaintiff repeats the allegations contained in Paragraphs 1 through 78 as if fully stated herein.

80. The various instances of discrimination, retaliation, and Defendants' failure to follow its own policies in response to complaints of harassment, collectively

amounted to sex-based discrimination and disparate treatment of Pellon-Irwin in violation of Title VII.

81. Pellon-Irwin suffered disparate treatment by Northern Light/May Hospital compared to her similarly situated peers who did not complain about sexual harassment or unsafe medical conditions in the ED.

82. Pellon-Irwin suffered disparate treatment by Northern Light/Mayo Hospital compared to Cline and Reimers when Plaintiff reported each male colleague's inappropriate and unprofessional behavior.

83. As a result of Defendants' discrimination and willful violation of Title VII, Pellon-Irwin has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Pamala Pellon-Irwin requests that the Court award her damages for Defendants' violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT IV – OPPOSING A PRACTICE MADE UNLAWFUL BY TITLE VII
### (42 U.S.C. § 2000e *et seq.*)

84. Plaintiff repeats the allegations contained in Paragraphs 1 through 83 as if fully stated herein.

85. Pellon-Irwin opposed a practice made unlawful by Title VII by making several explicit reports of sex-based discrimination and harassment.

86. Within 3 years of filing this Complaint, Pellon-Irwin repeatedly opposed Defendants' unlawful practices by making complaints of conduct in the workplace that violated Title VII.

87. As a result of Pellon-Irwin's protected conduct, Northern Light/Mayo Hospital took adverse action against her.

88. Defendants' adverse action against Pellon-Irwin, as set forth in detail above, bears a causal connection to her opposing practices made unlawful by Title VII.

89. A continuing violation of Title VII has occurred in this case.

90. As a result of Defendants' willful retaliation in violation of Title VII, Pellon-Irwin has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, liquidated damages, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Pamala Pellon-Irwin requests that the Court award her damages for Defendants' violation(s) of Title VII, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT V – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
### (5 M.R.S. § 4571 *et seq*.)

91. Plaintiff repeats the allegations contained in Paragraphs 1 through 90 of her Complaint as if fully set forth herein.

92. For the reasons set forth above, unlawful sex-based discrimination and retaliation have taken place within the meaning of the Maine Human Rights Act.

93. As a result of Defendants' discriminatory and retaliatory actions, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, liquidated and punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Pamala Pellon-Irwin respectfully requests that the Court enter judgment in her favor and against Defendants and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

### COUNT VI – VIOLATION OF THE MAINE WHISTLEBLOWER PROTECTION ACT
**(26 M.R.S. § 831 *et seq*.)**

94. Plaintiff repeats the allegations contained in Paragraphs 1 through 93 of her Complaint as if fully set forth herein.

95. For the reasons set forth above, Pellon-Irwin engaged in protected activity within the meaning of the Maine Whistleblower Protection Act.

96. Pellon-Irwin had a reasonable, good-faith basis for believing that Defendants' actions were illegal under Title VII and/or the MHRA when she made complaints about sexual harassment, unprofessional conduct that violated the Code of Ethics, and also unsafe medical practices.

97. Northern Light/Mayo Hospital took adverse action against Pellon-Irwin because of her protected activity.

98. As a result of Northern Light/Mayo Hospital's discriminatory and retaliatory actions, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, liquidated and punitive damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Pamala Pellon-Irwin respectfully requests that the Court enter judgment in her favor and against Defendants and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff Pamala Pellon-Irwin hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated:  June 10, 2025

>  */s/ Laura H. White*
>  _____
>  Laura H. White, Bar No. 4025
>  *Attorney for Plaintiff*
>  WHITE & QUINLAN, LLC
>  62 Portland Rd., Suite 21
>  Kennebunk, ME 04043
>  (207) 502-7484
>  *lwhite@whiteandquinlan.com*
>
>  */s/ Danielle M. Quinlan*
>  _____
>  Danielle M. Quinlan, Bar No. 5480
>  *Attorney for Plaintiff*
>  WHITE & QUINLAN, LLC
>  62 Portland Rd., Suite 21
>  Kennebunk, ME 04043
>  (207) 502-7484
>  *dquinlan@whiteandquinlan.com*